# In the United States Court of Federal Claims

No. 18-1561C
(Filed Under Seal: February 19, 2019)
(Reissued for Publication: February 27, 2019)[1]

| | | |
|---|---|---|
| ***************************************** | | |
| CONLEY & ASSOCIATES, INC., | * | |
| Plaintiff, | * | |
| | * | Corrective Action; Rational Basis Standard; Key Personnel; Bait and Switch; Best Value Determination; Agency Discretion; Motion for Permanent Injunction; Likelihood of Success on the Merits; Irreparable Harm; Balance of Hardships; Public Interests; 28 U.S.C. § 1491(b); RCFC 65(d); Denying Injunctive Relief. |
| v. | * | |
| THE UNITED STATES, | * | |
| Defendant. | * | |
| and | * | |
| VALKYRIE ENTERPRISES, INC., | * | |
| Defendant-Intervenor | * | |
| ***************************************** | | |

*Scott F. Lane*, with whom were *Katherine S. Nucci* and *Jayna M. Rust*, Thompson Coburn LLP, St. Louis, Missouri, for Plaintiff.

*Anthony F. Schiavetti*, Trial Attorney, with whom were *Joseph H. Hunt*, Assistant Attorney General, *Robert E. Kirschman*, *Jr.*, Director, *Douglas K. Mickle*, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, as well as *Scott N. Flesch*, Chief, Bid Protests, and *Major Sean Zehtab*, Trial Attorney, Department of the Army, Washington, D.C., for Defendant.

*J. Bradley Reaves*, with whom was *Beth V. McMahon*, ReavesColey, PLLC, Chesapeake, Virginia, for Defendant-Intervenor.

---

[1] The Court issued this decision under seal on February 19, 2019, and invited the parties to submit proposed redactions of any proprietary, confidential, or other protected information on or before February 26, 2019. The parties proposed to redact references to non-party offerors. The Court has replaced references to non-party offerors with [***].

OPINION AND ORDER

WHEELER, Judge.

This bid protest involves a contract for providing Command, Control, Communications, Computers, Intelligence, Surveillance, and Reconnaissance ("C4ISR") capability support services to the Army's Watercraft System ("AWS") vessels. AR 51. After winning the contract, plaintiff Conley & Associates, Inc. ("Conley") informed the Army that it could not produce an individual that it had proposed as one of its key personnel, and the Army decided to take corrective action.

Conley argues that the Army's decision to take corrective action and the scope of the Army's proposed corrective action are irrational because it did not misrepresent anything in its proposal and because the Army's awarding the contract to Conley was valid. The Government responds that Conley misrepresented its key personnel, Conley's misrepresentation created a defect in the Army's award determination, and the proposed corrective action would remedy that defect.

For the following reasons, the Court DENIES Conley's Motion for Judgment on the Administrative Record ("MJAR") and DENIES its accompanying request for a permanent injunction. The Court GRANTS the Government's Motion for Judgment on the Administrative Record.

Background

The Army issued the AWS solicitation on May 5, 2017. AR 135, 221. It included four evaluation factors: Technical, Program Management, Cost/Price, and Past Performance. AR 207-08. The Technical Factor included three subfactors: Field Support, Key Personnel, and Material Management. AR 208. Among other positions, the Key Personnel subfactor required a Field Service Manager ("FSM"). AR 208. The Army evaluated Key Personnel according to adjectival ratings of Outstanding, Good, Acceptable, Marginal, and Unacceptable. AR 212. Under the contract, the awardee would be required to "maintain an organization chart that identifies . . . key personnel," and the awardee would be required to update the chart and provide it to the Army "each time there are personnel changes." AR 158.

Seven offerors submitted bids. AR 4584. Conley, Defendant-Intervenor Valkyrie Enterprises, Inc. ("Valkyrie"), and a third offeror, [***] ("[***]"), all proposed Mr. David Barbour as their FSM. AR 615, 1021, 2588. In August and September 2017, the Army conducted an initial evaluation, a round of discussions, and a reevaluation. AR 4584-86. Conley, Valkyrie, and [***] each received an "Outstanding" rating for the Key Personnel subfactor based on Mr. Barbour's expertise. AR 4586, 4589-90. The other offerors received an "Acceptable" rating for the Key Personnel subfactor. AR 4586. Valkyrie

2

submitted the lowest price bid.  AR 4579.  On September 25, 2017, the Army awarded the contract to Valkyrie.  AR 4602.

On October 4, 2017, Conley filed a protest with the Government Accountability Office ("GAO").  AR 4601.  The Army decided to take corrective action and reevaluate the offers, so GAO dismissed Conley's protest as moot.  AR 4646, 4649.

After reevaluation, the Army again awarded the contract to Valkyrie.  Conley, Valkyrie, and [***] all again received an "Outstanding" rating for the Key Personnel subfactor.  AR 4922.  Conley protested the new award to the GAO.  AR 5106.  On April 26, 2018, the GAO sustained Conley's protest, concluding that the Army's technical evaluation departed from the Solicitation's criteria and that the Army's cost analysis was "inadequate or unreasonable."  AR 5411, 5414-15.

In the interim, in February 2018, Conley laid off Mr. Barbour, and Valkyrie hired him.  AR 6577.  In May 2018, Conley contacted Mr. Barbour about working on an AWS bridge contract.  AR 6577.  Mr. Barbour declined and "did not make any commitment or express willingness to return" to Conley.  AR 6577.  Conley did not offer Mr. Barbour employment again until August 20, 2018 (post-award), and Mr. Barbour at no time executed a contingent offer letter, nor consented to Conley's using his resume in its proposal.  AR 6577.

On June 5, 2018, the Army requested that offerors revalidate their original proposals.  AR 5424.1.  Conley, Valkyrie, and [***] all reaffirmed Mr. Barbour as their proposed FSM.  AR 5424.8, 5481, 5836.  Conley's final proposal revision ("FPR"), dated July 18, 2018, included Mr. Barbour's resume and identified him as a current Conley employee.  AR 1196-97, 5551.  Elsewhere in its FPR, Conley represented other key personnel as contingent hires.  E.g., AR 5536.

On August 13, 2018, the Army awarded the contract to Conley.  AR 6223.  The Army again assigned Conley an "Outstanding" rating for the Key Personnel subfactor.  AR 5862.  The Army noted that Conley's "key personnel are currently on staff or are contingent hires . . . available day one of contract award."  AR 5867.

On August 20, 2018, Conley offered to rehire Mr. Barbour, and Mr. Barbour declined.  AR 6577-78.  On September 12, 2018, Conley sent the Contracting Officer ("CO") a letter requesting approval to replace Mr. Barbour as its FSM.  AR 6485-86.  The Army did not respond.  Pl. MJAR at 17.  Meanwhile, on August 28, 2018, Valkyrie filed a protest with the GAO, alleging, among other things, that Conley failed to inform the Army that Mr. Barbour was unavailable to perform the contract for Conley.  AR 6492, 6498-99.

On September 26, 2018, the Army decided to take corrective action based on a "review of Valkyrie's [GAO] protest."  AR 6587.  The CO found that two of Valkyrie's

protest allegations "might have merit": (1) That "Conley failed to advise the Army of its lack of certain key personnel"; and (2) that this produced a "flawed best value analysis." AR 6587.  The Army proposed to reevaluate the offerors' July 2018 FPRs and make a new award decision.  AR 6587.  The GAO then dismissed Valkyrie's protest.  AR 6599.

On October 9, 2018, Conley filed its complaint with this Court.  Dkt. No. 1.  The parties finished briefing the issues on December 21, 2018, and the Court held oral argument on January 30, 2019.  Dkt. Nos. 29, 33, 34, 36-38, 41.  The Army voluntarily stayed its proposed corrective action while the Court considered Conley's protest.

Analysis

The Tucker Act grants this Court subject-matter jurisdiction over bid protests.  28 U.S.C. § 1491(b)(1) (2012).  In a bid protest, the Court reviews an agency's decision pursuant to the standards set out in the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706.  The APA provides that "a reviewing court shall set aside the agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

Under the APA, a court may set aside a corrective action if it "lack[s] a rational basis."  Dell Fed. Sys., L.P. v. United States, 906 F.3d 982, 990 (Fed. Cir. 2018) (citations omitted).  The rational basis standard is "highly deferential."  Id. at 992 (citations omitted).  An agency need only provide a "coherent and reasonable explanation" for its action.  Id.  A reviewing court may only consider the agency's reasoning for its action.  Balestra v. United States, 803 F.3d 1363, 1373 (Fed. Cir. 2015) (citations omitted).  However, a court must uphold even "an agency decision of less than ideal clarity, if the agency's path may reasonably be discerned."  Id. (citation omitted).

This protest presents two questions.  First, did the Army rationally identify an issue with the procurement that justifies corrective action?  And second, is the scope of the Army's proposed corrective action rationally related to the defect it identified?

I.      The Army Provided a Rational Explanation for Corrective Action.

Conley argues first that the record "is void of any coherent or reasonable explanation" for the Army's decision to take corrective action.  Pl. MJAR at 22-23. Second, Conley asserts that the Army had no rational basis to conclude that Valkyrie's GAO protest allegations—key personnel unavailability and a flawed best value determination—had enough merit to justify corrective action.  Pl. MJAR at 22-23.  Finally, Conley argues that the solicitation allowed for post-award key personnel substitutions, that it intended to refute Valkyrie's GAO protest grounds, and that it did not act improperly in bidding on the AWS contract.  For the following reasons, Conley's arguments all fail.

4

### A. The Army's Reason for Corrective Action

Based on a "review of Valkyrie's [GAO] protest," the CO found that two of Valkyrie's protest grounds "might have merit."[2] The CO found that "Conley failed to advise the Army of its lack of certain key personnel," producing a "flawed best value analysis" that justified taking corrective action. AR 6587.

Because the Army must have a rational explanation for taking corrective action, its reliance on Valkyrie's protest grounds to justify corrective action must be rational. Therefore, the corrective action is valid if (i) Conley was obligated to inform the Army that Mr. Barbour was unavailable to perform at the time of FPR submissions and (ii) the AR contains sufficient evidence for the CO to rationally conclude that Mr. Barbour was unavailable at that time—i.e., that Conley misrepresented its key personnel.

### B. Valkyrie's Protest Grounds

The AR supports the Government's claim that Conley misrepresented Mr. Barbour's availability at the time of FPR submissions, thus warranting the Army's corrective action. The Government and Valkyrie effectively allege that Conley engaged in a "bait and switch," a maneuver in which an awardee proposes certain key personnel, then substitutes them for other individuals post-award.[3] See Fulcra Worldwide, LLC v. United States, 97 Fed. Cl. 523, 540 (2011). A "bait and switch" has four elements:

> (1) The awardee represented in its proposal that it would rely on certain specified personnel in performing the services; (2) the agency relied on this representation in evaluating the proposal; (3) it was foreseeable that the individuals named in the proposal would not be available to perform the contract work; and (4) personnel other than those proposed are performing services.

Id. (citations omitted).

Elements (1), (2), and (4) are not at issue here. The parties do not dispute that Conley proposed Mr. Barbour as its FSM, and that Conley asked the Army to substitute another FSM for Mr. Barbour post-award. AR 6485-86. And the Army relied on Conley's

---

[2] The CO's using the phrase "might have merit" is irrelevant to whether the Army rationally decided to take corrective action. An agency does not have to state the grounds for corrective action unequivocally for its decision to be rational.

[3] Conley contends that the Government cannot argue a "bait and switch" because neither Valkyrie's GAO protest nor the AR specifically mention "bait and switch." This is incorrect. The Government does not have to use a set of magic words to argue the theory. The Government alleged that Conley misrepresented key personnel in its FPR, then tried to substitute key personnel post-award—the definition of a "bait and switch." That is sufficient.

representation: In its award determination, the Army identified Mr. Barbour as "currently on staff" or a "contingent hire . . . available on day one of contract award." AR 5867.

However, Conley argues that element (3), foreseeability, requires that an awardee have "actual knowledge" that key personnel would be unavailable to perform. The Government responds that negligence is sufficient. The Court agrees with the Government.

### 1.     The Foreseeability Element of a Bait and Switch

According to this Court's decisional law, "'negligence' is the minimum level of knowledge necessary to establish the [foreseeability] element of an improper bait-and-switch." Consol. Eng'g Servs., Inc. v. United States, 64 Fed. Cl. 617, 633 (2005). This standard makes the most sense. An "actual knowledge" standard would be inconsistent with prior case law and the plain meaning of foreseeable, and it would distort incentives for offerors to submit accurate proposals.

The term "bait and switch" in government contracts law appears to originate from a protest before the General Services Board of Contract Appeals ("Board"). Planning Research Corp. v. United States, 971 F.2d 736, 739-41 (Fed. Cir. 1992). In that case, the awardee listed certain key personnel in its proposal, then made "extensive" post-award substitutions. Id. at 739. The Federal Circuit concluded that the awardee "intended a 'bait and switch,'" citing a Comptroller General case in which the awardee proposed key personnel who never authorized the awardee to use their names. Id. at 739-41 (citation omitted). The Federal Circuit reviewed circumstantial evidence and did not require "actual knowledge" to show that the awardee executed a "bait and switch." See id.

The debate about "actual knowledge" versus "negligence" is itself needlessly complicating. "Foreseeable" has a plain meaning: "1: being such as may be reasonably anticipated," and "2: lying within the range for which forecasts are possible." Foreseeable, Merriam-Webster.com (last visited February 13, 2019). The Court has no reason to believe that previous courts citing the elements of a "bait and switch" used "foreseeable" to mean anything other than "able to be reasonably anticipated." See, e.g., Fulcra Worldwide, LLC, 97 Fed. Cl. 523 (2011); OAO Corp. v. United States, 49 Fed. Cl. 478 (2001).

Conley cites DZSP 21, LLC, B-410486.10, Jan. 10 2018, 2018 CPD ¶ 155, for support that a bait and switch requires actual knowledge of unavailability. Pl. MJAR at 26. However, DZSP is inconsistent with the decisional law of this Court. See Consol. Eng'g Servs., Inc., 64 Fed. Cl. at 633 (negligence is sufficient for foreseeability); OAO Corp., 49 Fed. Cl. at 482 (offerors are "obligat[ed] to ascertain the continuing availability of key personnel at the time of" FPRs) (citations omitted). Further, in DZSP, the GAO found that offerors need not be "in constant contact" with their proposed key personnel to ensure their availability "at all times" prior to contract award. DZSP 21, LLC, 2018 CPD

¶ 156. The Court declines to interpret this language as validating an offeror's willful ignorance of unavailability at the time FPRs are due.

In sum, the foreseeability element requires that an offeror knew or should have known, at the time of FPR submissions, that their proposed key personnel would be unavailable to perform. If the AR contains sufficient evidence to show that the offeror could have foreseen that its key personnel would be unavailable, then an agency could rationally conclude that the offeror committed a bait and switch.

        2.      Mr. Barbour's Unavailability Was Foreseeable.

When Conley submitted its FPR in July 2018, it was foreseeable that Mr. Barbour would not be available to perform the contract. In February 2018, Conley laid off Mr. Barbour, Mr. Barbour accepted a job with Valkyrie, and Conley knew that Mr. Barbour worked for Valkyrie. AR 6577. Between February 2018 and Conley's FPR submission, Mr. Barbour did not "commit[] or express willingness to return" to Conley, Conley did not ask to use his name and resume in its proposals, and Mr. Barbour did not execute any contingent hire letter. Id. If Mr. Barbour had provided Conley with definitive assurances—such as a contingent hire letter—that he would return to perform the AWS contract, Conley would have strong evidence that it was not foreseeable that Mr. Barbour would be unavailable.

Nevertheless, Conley's FPR proposed Mr. Barbour as FSM, included Mr. Barbour's resume in its proposal, and identified him as a current Conley employee, even though Conley separately represented other key personnel as "contingent hire[s]." AR 1196, 1197, 5536, 5551. Conley simply assumed that Mr. Barbour would return because he worked for Conley for seven years, he helped draft Conley's proposal, and Conley had had "discussions" with him about returning. Pl. Reply & Resp. at 10.

For these reasons, it was foreseeable that Mr. Barbour would be unavailable to perform the contract at the time Conley submitted its FPR. As a result, Conley committed an improper "bait and switch" that tainted the Army's procurement. Valkyrie pointed out Conley's misrepresentation in its protest grounds, and the Army identified this as its reason for taking corrective action. The Army's "path" here "may reasonably be discerned," Balestra, 803 F.3d at 1373, and so its decision to take corrective action is rational.

        C.      Conley's Remaining Arguments All Fail.

Conley next suggests that the Army's corrective action is irrational because the solicitation language requiring the contractor to update the Army regarding any key personnel changes permits post-award key personnel changes. AR 158. Not so. The RFP language does not allow offerors to substitute individuals who were foreseeably

7

unavailable at the time of FPR submissions for other individuals post-award. See OAO Corp., 49 Fed. Cl. at 482 (offerors are obligated to submit accurate proposals).

Conley then argues that the "Army had no basis to conclude that it acted improperly" and that Conley's counsel informed the Army that it would refute Valkyrie's GAO protest allegations. Pl. MJAR at 25-26. Neither point is relevant because neither has any bearing on whether the evidence shows that Mr. Barbour's unavailability was foreseeable when Conley submitted its FPR, and so has no impact on the Army's corrective action decision.

II.     The Scope of the Army's Corrective Action

Conley argues next that the Army's proposed corrective action is "unfairly designed to reject" Conley's proposal because the Army plans to reevaluate offers without accepting proposal revisions with the knowledge that Mr. Barbour is not available to perform for Conley. Pl. MJAR at 29-30. Alternatively, Conley argues that the Army has already opened discussions by removing Mr. Barbour from its proposal, and therefore, the Army must now allow proposal revisions. Pl. MJAR at 35-37. These arguments fail as well.

A.      Decision Not to Hold Discussions and Fairness of the Corrective Action

An agency only needs a "coherent and reasonable explanation" for its proposed corrective action. Dell Fed. Sys., 906 F.3d at 992. When an offeror improperly attempts to substitute key personnel, the agency may "either evaluate the proposal as submitted, where the proposal would be rejected as technically unacceptable . . ., or open discussions to permit the offeror to amend its proposal." Chenega Healthcare Servs., LLC v. United States, 138 Fed. Cl. 644, 652 (2018). If an agency chooses to accept further revisions after offerors submit FPRs, it must accept revisions from all offerors because it must treat all offerors fairly. See id. at 651-52.

The Army's decision to reevaluate proposals without holding discussions was within its discretion. The Army provided rational reasons for not wanting to reopen discussions and accept revised proposals, including finality and speedy resolution of the procurement process. See Tr. Oral Argument, Conley & Assoc. v. United States (No. 18-1561). The proposed corrective action does not discriminate against Conley because it will consist of reevaluating all offerors' FPRs' Technical Factor, including the Key Personnel subfactor, according to the same evaluation standards.

Conley attempts to distinguish Chenega on several grounds, all wanting. Pl. MJAR at 30. First, Conley argues that in Chenega, the agency moved forward with the procurement as planned, whereas here the Army "affirmative[ly]" chose a corrective action that would harm Conley. Pl. MJAR at 30. But in Chenega, the offeror attempted to substitute key personnel pre-award, and the solicitation language barred the late stage substitution. The issue here arose post-award, so the Army's only way to remedy the defect

8

caused by Conley's misrepresentation was to "affirmatively" decide to conduct corrective action. Second, Conley's point that the agency in Chenega chose not to hold discussions at all, whereas here the Army held discussions earlier in the procurement process, has no impact on the Army's broad discretion to conduct corrective action as it sees fit. Finally, if Conley is "trouble[ed]," Pl. MJAR at 31, by competitors hiring employees that it laid off, it should do more to hire and retain its personnel instead of complaining to the Court.

### B.  Whether the Army Already Opened Discussions

The "acid test" for whether an agency has engaged in discussions is whether it provided an opportunity for proposals to be revised or modified. Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 215, 229-30 (2008). Once discussions have occurred, an opportunity for proposal revisions is required. FAR 15.307.

The Army does not plan to remove Mr. Barbour from, or otherwise revise, Conley's proposal. The Army plans to evaluate Conley's proposal as submitted, but with the knowledge that Mr. Barbour is not a current or contingent Conley employee, works for a rival company, made no commitment to perform, and is otherwise unlikely to perform the contract for Conley. Conley misrepresented Mr. Barbour's availability, creating a procurement defect that the Army now intends to correct.

### III.  Standard for Permanent Injunctive Relief

In deciding whether to grant injunctive relief, the Court considers whether: (1) the plaintiff has succeeded on the merits; (2) the plaintiff will suffer irreparable harm without an injunction; (3) the balance of hardships favors an injunction; and (4) an injunction would serve the public interest. Dell Fed. Sys., 906 F.3d at 990–91 (citation omitted). "[S]uccess on the merits is a necessary element for a permanent injunction." Id. at 999.

For the reasons stated in Sections I and II above, Conley's case fails on the merits. Therefore, Conley is not entitled to an injunction.

### Conclusion

In conclusion, the Court DENIES Conley's Motion for Judgment on the Administrative Record and DENIES Conley's request for a permanent injunction. The Court GRANTS the Government's Motion for Judgment on the Administrative Record. The Clerk shall enter judgment in favor of the Government. No costs. Plaintiff Conley & Associates, Inc.'s complaint is dismissed without prejudice.

IT IS SO ORDERED.

                                               s/ Thomas C. Wheeler
                                               THOMAS C. WHEELER
                                               Judge